617 A.2d 632

**CELTA CORPORATION**

v.

**A.G. PARROTT COMPANY.**

**No. 1907, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Jan. 4, 1993.

Jonathan Scott Smith, Columbia, for appellant.

Bruce E. Kauffman (Jeffrey L. Forman and Kauffman and Forman, P.A. on the brief), Towson, for appellee.

Argued before MOYLAN, GARRITY and MOTZ, JJ.

GARRITY, Judge.

The matter before us is an appeal from a judgment by the Circuit Court for Howard County (Sweeney, J.) granting a Petition to Establish and Enforce a Mechanic's Lien. It involves two issues. First, we are asked to review the lower court's factual determination as to whether the cost of certain work installing street trees was or was not properly accounted for under a contract between the developer and a contractor. The second issue before us is whether the trial court correctly calculated the per lot share of a blanket mechanics lien for improvements to a development consisting of 141 lots, when 126 of the lots had been sold and were no longer subject to the mechanics lien and the remaining 15 lots were still owned by the developer.

## FACTS

Appellant, Celta Corporation ("Celta") is the owner and developer of a residential housing development in Howard County known as Brampton Hills. A.G. Parrott Company ("Parrott") is an excavating and paving contractor that provided paving, grading, installation of sanitary sewers, and other services to Celta in various sections of the Brampton Hills development.

Celta and Parrott entered into two written contracts on November 21, 1986. The first contract (Contract # 1) was for grading and installation of sewer, water, and storm drains, curbs and street paving in Brampton Hills. It totalled $1,738,081.40. The second contract (Contract # 2) was for the sum of $592,997.16 and provided for other work, including the installation of street trees. Both contracts were concerned only with section 4 of Brampton

Hills, which is comprised of lots 77 through 217 (141 total lots).

Because of Celta's inability to secure complete financing through its construction lender, Celta divided the work to be done at Brampton Hills by Parrott into the two contracts referenced above. Celta expected to gain substantial savings by redesigning various aspects of the work under Contract # 1 and providing that work performed under Contract # 2 could be paid for under Contract # 1. Thus, as work was completed under Contract # 2 it was to be transferred by change order to Contract # 1 and billed through Contract # 1. The installation of street trees was covered under Contract # 2.

From June 1987 through May 1990, significant work was completed under the two contracts. On July 18, 1990, as a result of non-payment by Celta, however, Parrott sent Celta notice of intention to terminate the contract. Parrott ultimately terminated the contract on July 24, 1990.

On July 31, 1990, Parrott filed a petition to establish and enforce a mechanic's lien in the amount of $143,726.66 against the property owned by Celta at Brampton Hills. Celta filed a Motion to Dismiss, and Parrott filed an amended petition, which, among other things, increased the amount sought to $159,249.22. After a show cause hearing, an interlocutory lien was issued on November 28, 1990.

On May 9, 1991, the case proceeded to a trial on the merits. Parrott sought the mechanic's lien for the amount of unpaid bills for contract work, extra work and the cost of certain road repairs. Celta disputed the balance due Parrott for the contract work and also argued that it was due credits and set-offs for work not performed under the contracts and to repair certain defective work. After five days of hearings, consideration of voluminous affidavits and other documents, and review of the proposed findings of fact and law submitted by the parties, the trial judge issued a memorandum opinion consisting of 103 separate findings. The court ultimately ruled that Parrott was enti-

tled to a mechanic's lien in the amount of $75,097.15 against the 15 Brampton Hills lots owned by Celta. This ruling was based on the following reconciliation:

| | | |
|---|---|---:|
| Agreed contract price, including Change Orders 1 through 16 | $ | 2,342,183.40 |
| less Celta's payments to Parrott | — | 2,070,341.91 |
| Amount owed Parrott under Contract # 1 | $ | 271,841.49 |
| less final paving credit due Celta | — | 74,331.49 |
| less sidewalk credit due Celta | — | 47,403.85 |
| less total of other set-offs awarded Celta | — | 75,009.00 |
| Net amount owed Parrott (lien amount) | $ | 75,097.15 |
| Lien amount divided by number of lots owned by Celta (15) | $ | 5,006.41 |

Celta claims on appeal that it should have received an additional credit ($87,807.15) due to Parrott's failure to install the street trees as agreed in Contract # 2.

## QUESTIONS PRESENTED

1. Whether the trial court erred by failing to award a credit for the cost to install street trees.

2. Whether the trial court erred by incorrectly calculating the pro rata amount of the lien applicable to each lot.

## ANALYSIS

### Credit for Street Tree Costs

Finding and conclusion number 93 in the trial court's Memorandum Opinion is as follows:

93. Celta contends that the costs of the installation of the street trees in the amount of $87,807.72 is included in the final contract sum and thus seeks a credit for this amount. Street trees were an item of Contract 2 which were never transferred to Contract 1 by change order because the street trees were not installed. Celta is not entitled to a credit of $87,702.72.

On appeal, Celta contends that the trial court erred and that a credit was in fact due to Celta for the street trees in the amount of $87,807.72. Had the trial court awarded this credit to Celta there would have been no basis for the ordering of a mechanic's lien since the credit being sought by Celta is greater than the $75,097.15 mechanic's lien against its property.

In reviewing the trial court's factual finding regarding whether the credit claimed by Celta was allowable, we may not set aside the trial court's finding on the evidence unless it is clearly erroneous, and we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Md.Rule 8–131(c).

We hold that the methodology employed by the trial court to determine the amount due to Parrott for work at Brampton Hills was sound, that the trial court properly reconciled the amount due to Parrott, and that the appellant was due no credit for the cost of installing street trees. We shall affirm the trial court's determination as to the amount subject to the mechanic's lien.

As noted earlier, the parties mutually agreed that Contract # 1 would be the "base" contract for work done at Brampton Hills. Any work performed under Contract # 2 would be transferred by change order to Contract # 1 and billed through Contract # 1.

In determining the amount, if any, owed by Celta to Parrott, the court first retraced the steps taken by the two parties in the change orders to Contract # 1. There were 16 change orders in all, and as a result of the various additions and subtractions to the total contract price resulting from these change orders, the contract price increased from $1,738,081.40 to $2,342,183.40. None of the 16 change orders transferred the charge for street trees from Contract # 2 to Contract # 1.

In determining the amount, if any, owed by Celta to Parrott, the court charged Celta only for work listed under Contract # 1, additional work agreed to by both parties, and

those portions of Contract # 2 that were actually accomplished and transferred to Contract # 1 from Contract # 2 through a change order. This conforms with the agreement reached by the parties and their practice during the period of work under the contract.

Those portions of Contract # 2 that were not completed by Parrott and not transferred to Contract # 1 by change order were not counted as part of the contract payment due from Celta to Parrott. The installation of the street trees under Contract # 2 was treated by the court in this manner. The installation was not completed by Parrott, the cost of the installation was not transferred by change order to Contract # 1 and, accordingly, the court properly did not include the $87,702.72 in the contract price.

After determining the contract price, the court then determined how much Celta paid Parrott under the contract and whether any credits were due Celta.

### Allocation of Mechanics Lien

The second issue before us relates to the proper allocation of the mechanic's lien among the remaining lots in Brampton Hills. The trial court ruled that the total amount of the lien should be divided among the 15 lots in Brampton Hills owned by Celta. Hence, it found that each lot was subject to a mechanic's lien in the amount of $5,006.47. Celta, however, argues that the total amount of the lien should be apportioned equally among the 141 lots in Brampton Hills, despite the fact that 126 lots had been sold to bona fide purchasers for value and were therefore no longer subject to a mechanic's lien. The net result of Celta's proposed allocation of the lien among the remaining properties would be to subject the 15 lots still owned by the appellant to a lien of $532.60 and decrease the total amount of the mechanic's lien actually secured by Celta's property from $75,097.15 to $7,989.00.

■ Under the circumstances in this case, i.e., where a number of the lots in a subdivision have been sold to bona

fide purchasers for value and no third persons would be damaged by shifting the burden of a mechanic's lien for work done for the benefit of the entire subdivision onto the remaining lots held by the owner, we hold that a lien creditor may properly shift the burden to such lots. We further hold, however, that a lienor's ability to shift the burden of the mechanic's lien to the remaining lots held by the owner is limited to the pro rata amount by which each lot benefitted from the overall contract. Since each lot received $15,215.88 [1] in improvements, and the lien sought against the remaining lots was for $5,006.47 per lot, the trial court correctly allowed the lienor to shift the entire burden of the mechanic's lien onto the 15 lots still held by the owner. We shall explain.

Maryland Real Property Article, § 9–102(b), the statutory section dealing with the establishment of a mechanic's lien for installation of various utilities and other items servicing all the lots in a parcel of land under development, provides as follows:

> (b) Waterlines, sewers, drains and streets in development.—If the owner of land or the owner's agent contracts for the installation of waterlines, sanitary sewers, storm drains, or streets to service all lots in a development of the owners's land, each lot and its improvements, if any, are subject, on a basis pro rata to the number of lots being developed, to the establishment of a lien as provided in subsection (a) of this section for all debts for work and material in connection with the installation.

Under subsection (a) of Real Property Article § 9–102, the property is subject to a lien "for the payment of all debts, without regard to the amount, contracted for work done for or about the building and for materials furnished for or about the building ..."

---

**1.** We calculate the improvements to each lot as follows: the total contract price ($2,342,183.40), less work not done and other credits ($196,744.34), equals total improvements of $2,145,439.06. Total improvements divided by the number of lots in the development (141) equals $15,215.88 in improvements to each lot.

The final statutory provision affecting the establishment of the lien in this case provides that land may not be subjected to a lien if, prior to the establishment of a lien, legal title has been granted to a bona fide purchaser for value. Maryland Real Property Article, § 9–102(d), *Himmighoefer v. Medallion Industries, Inc.*, 302 Md. 270, 487 A.2d 282 (1985).

■ The purpose of the Maryland mechanic's lien statute is to protect those who furnish labor and materials during the construction process. *Riley v. Abrams*, 287 Md. 348 (1980). The mechanic's lien statute itself states that it is remedial in nature and shall be so construed to give effect to its purpose. Maryland Real Property Article, § 9–112. Similarly, Maryland courts have consistently stated that the mechanic's lien law is to be liberally construed in favor of lien claimants. *Johnson v. Metcalfe*, 209 Md. 537, 121 A.2d 825 (1956); *T. Dan Kolker, Inc. v. Shure*, 209 Md. 290, 121 A.2d 223 (1956); *District Heights Apartments v. Noland*, 202 Md. 43, 95 A.2d 90 (1953). On the other hand, we have no power to extend the mechanic's lien law beyond the obvious designs and plain requirements of the statute. *Freeform Pools, Inc. v. Strawbridge Home For Boys, Inc.*, 228 Md. 297, 179 A.2d 683 (1962); *Caton Ridge, Inc. v. Bonnett*, 245 Md. 268, 225 A.2d 853 (1967).

The parties agree that there is no question under Maryland law that a lien may be had against fewer than all of the lots in a subdivision when a portion of the lots have been sold to third parties and are therefore no longer subject to a mechanic's lien. There is no question that at a minimum the 15 lots owned by Celta are each subject to a mechanic's lien of at least $532.60. The question before us is the extent to which those 15 lots may be liable, if at all, for the portion of the lien theoretically attributable to the 126 lots sold by Celta to third parties.

We are aware of no Maryland case law that squarely addresses this issue. The extent to which a mechanic's lien may be brought against fewer than all of the lots in a

subdivision when the lien is for work done for the benefit of all the lots in the subdivision, however, has been addressed in other jurisdictions. The general rule that has emerged is as follows:

> *Where it is sought to enforce the lien on less than the whole number of buildings or lots, each building has been held subject to the lien* only to the extent of what was done or furnished therefor, and each lot only to the extent of what was done or furnished for the building or improvement thereon. 57 C.J.S. 741, § 189. (Emphasis added).

This general rule is supported in the case law of numerous jurisdictions. For example, in *United Virginia Mortgage Corporation et al. v. Haines Paving Co., Inc.*, 221 Va. 1047, 277 S.E.2d 187 (1981), the Virginia Supreme Court specifically addressed this issue in a case where the question before the Court was whether a lien claimant's failure to perfect a lien on one of the subdivision lots he sought to encumber would estop the lien claimant from enforcing the entire lien against the remaining lots. The Virginia Supreme Court applied the general rule above, with the additional requirement that such a shift in the allocation of the lien among the remaining lots would not be allowed where the shift injuriously affected the rights of third parties. The Court stated:

> Haines failed to perfect the lien upon one of the lots he sought to encumber, and the chancellor "released" the lien as to that lot. Like the releases in PIC, this shifted the full burden of the claim to the remaining lots. As the secured creditor under a deed of trust, UVMC had a valuable interest in those lots. But, when such a shift in the burden occurs, the lien is enforceable only when "there were no third persons whose interests were injuriously affected" by the shift. *Weaver*, 176 Va. at 234, 10 S.E.2d at 551.

The Virginia Supreme Court's concern that shifting the burden of the mechanic's lien not injure third parties is shared by other courts that have considered this question.

In fact, in *Associated Sand and Gravel Co. v. DiPietro*, 8 Wash.App. 938, 509 P.2d 1020 (1973), a case relied upon by the appellant, the Washington Court of Appeals would not allow the lien to be shifted onto the remaining lots because such a shift would be injurious to third parties. It is apparent from that court's holding that if third parties had not been injuriously affected, the court would have allowed such a shift.

> We are aware of the fact that the authorities are not agreed as to this, but, we think, the weight of authority and the force of reason sustain the view that the release of a portion of the properties, under the circumstances of this case, embraced by the lien, precludes its successful assertion against the remainder. This is true only where the interests of other lien creditors are affected. It would not be so in the case of the owner and the lienor. *Associated Sand and Gravel, Id.* 509 P.2d at 1023.

The general rule allowing a lien creditor to shift the burden of a blanket lien for work performed for the benefit of the entire subdivision onto the remaining lots owned by the owner/developer benefits the materialman and is therefore in keeping with the purpose of the Maryland lien law. Under this rule, however, the lien claimant's recovery is at all times limited to those lots actually held by the owner and the lien may not exceed the extent to which those specific lots benefitted from the labor and material supplied by the lien claimant.

The shifting of the lien from the lots sold to third parties onto the remaining lots retained by the owner is also fair and equitable to the landowner. Under the rule, none of the owner's lots are ever subject to a lien in excess of the value of the labor and material that benefitted each lot. The "shifting" of the burden onto the remaining lots held by the landowner is equitable because the landowner has received full value for each of the lots sold to third parties. § 9–102(b). The landowner's remaining lots are subject to an increased lien only to the same extent that the landown-

er has already been compensated by the purchasers of the released lots. There is no prejudice to the landowner.

Applying the pro rata apportionment formula set forth in § 9–102(b), each of the 141 lots in Brampton Hills received $15,215.88 in improvements under the contract between Celta and Parrott. Since this number represents the extent to which each lot was improved by work done by Parrott, and the lien sought by Parrott was for only $5,006.47 per lot, we shall affirm the trial court's finding that the total amount of the lien may be secured by shifting the entire amount of the lien onto the remaining 15 lots owned by Celta.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.